1

```
                    UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .    Criminal No. 1:12cr38
                              .
     vs.                      .    Alexandria, Virginia
                              .    February 1, 2012
OTASOWIE CHRISTOPHER ASUEN,   .    2:43 p.m.
                              .
               Defendant.     .
                              .
.  .  .  .  .  .  .  .  .  .   .
```

```
                 TRANSCRIPT OF DETENTION HEARING
         BEFORE THE HONORABLE THERESA CARROLL BUCHANAN
                UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

FOR THE GOVERNMENT:              KIMBERLY R. PEDERSEN, AUSA
                                 PATRICIA M. HAYNES, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314


FOR THE DEFENDANT:               NINA J. GINSBERG, ESQ.
                                 DiMuro Ginsberg PC
                                 1101 King Street, Suite 610
                                 Alexandria, VA 22314


TRANSCRIBER:                     ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Fifth Floor
                                 401 Courthouse Square
                                 Alexandria, VA 22314
                                 (703)299-8595



                       (Pages 1 - 39)



(Proceedings recorded by electronic sound recording, transcript
  produced by computerized transcription.)

2

<u>I N D E X</u>

|                                | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|--------------------------------|:-------------:|:------------:|:---------------:|:--------------:|
| <u>WITNESS ON BEHALF OF</u><br><u>THE GOVERNMENT:</u> |  |  |  |  |
| SA David Defilippis            | 3             | 15           | 32              |                |


EXHIBITS

|                    | <u>MARKED</u> | <u>RECEIVED</u> |
|--------------------|:-------------:|:---------------:|
| <u>GOVERNMENT'S:</u> |  |  |
| No. 2              |               | 14              |

Defilippis - Direct                                                3

1                        P R O C E E D I N G S

2                        (Defendant present.)

3              THE CLERK:  Recalling the United States of America v.

4    Otasowie Asuen, Case 12cr38.

5              MS. PEDERSEN:  Good afternoon, Your Honor.  Kim

6    Pedersen and Trish Haynes for the United States.

7              MS. GINSBERG:  Good afternoon again, Your Honor.

8              THE COURT:  All right.

9              MS. GINSBERG:  Nina Ginsberg for Mr. Asuen.

10             THE COURT:  Good afternoon.

11             MS. PEDERSEN:  We have some testimony that we'd like

12   to put on.

13             THE COURT:  Okay.

14             MS. PEDERSEN:  We call Special Agent David

15   Defilippis.

16     SPECIAL AGENT DAVID DEFILIPPIS, GOVERNMENT'S WITNESS, SWORN

17                        DIRECT EXAMINATION

18   BY MS. PEDERSEN:

19   Q.   Good afternoon, Agent.  Will you please state your full

20   name and spell your last name.

21   A.   Good afternoon.  My name is David Defilippis,

22   D-e-f-i-l-i-p-p-i-s.

23   Q.   For whom do you work?

24   A.   The FBI.

25   Q.   What's your current assignment?

Defilippis - Direct                                                    4

1    A.    I'm a special agent.

2    Q.    How long have you been with the FBI?

3    A.    Approximately ten years.

4    Q.    Are you assigned to a certain squad with the FBI?

5    A.    I am.  I'm assigned to an organized crime squad that also

6    investigates civil rights matters.

7    Q.    In April of 2011, did you and the FBI join an

8    investigation which had been started by Montgomery County

9    Police Department into criminal enterprises involving

10   racketeering offenses such as prostitution?

11   A.    I did.

12   Q.    Was the defendant, Otasowie Christopher Asuen, one of the

13   subjects of the investigation?

14   A.    Yes, he was.

15   Q.    Do you see him in the courtroom today?

16   A.    Yes.  He's seated right at the defense table.

17          THE COURT:  The record will reflect you identified

18   the defendant.

19   BY MS. PEDERSEN:

20   Q.    Did the investigation include those enterprises called

21   Classy DC Escorts and DMV Indies?

22   A.    Yes, it did.

23   Q.    Okay.  Are those both businesses engaged in prostitution?

24   A.    They are.

25   Q.    What role did the defendant, Asuen, have with DMV Indies

Defilippis - Direct                                                          5

1    and Classy DC Escorts?

2    A.    Mr. Asuen was the owner and operator of DMV Indies.  He

3    also had a relationship with the owner and operator of Classy

4    DC Escorts, and they shared resources.

5    Q.    What was the nature of their relationship?

6    A.    We understand they were good friends.

7    Q.    Okay.  And is that the lead defendant in the indictment,

8    Kuraye Akuiyibo?

9    A.    It is.

10   Q.    Okay.  Did the two businesses run in a similar fashion?

11   A.    Yes.

12   Q.    Okay.  Can you basically explain how they operated?

13   A.    They would -- they had a Web site whereby they would post

14   pictures of women, prostitutes who they'd recruit from around

15   the country who would voluntarily come into the metro D.C. area

16   to work for approximately a week using some sort of working

17   name, not their true name.  Mr. Asuen and Mr. Akuiyibo would

18   pay for their hotel and/or their travel.  They'd stay at hotels

19   in the Washington, D.C. metro area.

20           Then prospective clients would go onto the Web sites,

21   Classy DC Escorts and/or DMV Indies, and based on photos they

22   would see on the Web sites of girls, they would make

23   appointments, and based on those appointments, they would meet

24   with these women in various hotels for the purposes of

25   prostitution.

Defilippis - Direct                                                    6

1    Q.    How was the money derived from prostitution collected and

2    remitted back to the business owners?

3    A.    The money was collected by an individual who would come on

4    a nightly basis to collect the proceeds.

5    Q.    Did the defendant, Asuen, have other employees who worked

6    for him for DMV Indies?

7    A.    He did.

8    Q.    Okay.  Did he have a call taker?

9    A.    He did.

10   Q.    Did he have women who were working as prostitutes?

11   A.    He did.

12   Q.    Did he have someone who collected the money for him?

13   A.    Yes, he did.

14   Q.    Was one of the people who collected the money one of his

15   brothers?

16   A.    Yes.

17   Q.    Did he also use various bank accounts?

18   A.    Yes.

19   Q.    Did he have some bank accounts that were in his name?

20   A.    Yes.

21   Q.    Did he, did he use bank accounts in the names of others,

22   including another brother of his?

23   A.    That's correct.

24   Q.    In 2011, did the Fairfax County police arrest women who

25   were working as prostitutes for DMV Indies?

Defilippis - Direct                                          7

1  A.    They did.

2  Q.    And did those women admit to working for the defendant and

3  his call taker, Lisa?

4  A.    They admitted to working for an individual by the name of

5  Chris and a call taker by the name of Lisa.

6  Q.    In December of 2011, did Fairfax County arrest one of the

7  defendant's brothers for pandering?

8  A.    Yes.

9  Q.    Did the defendant's business continue both after the

10  arrest of his brother for pandering and also after the arrest

11  of the female prostitutes?

12  A.    Yes, his business continued.

13  Q.    During the course of your investigation, did you and

14  financial analysts have occasion to obtain and analyze bank

15  records belonging to Classy DC Escorts and its associates?

16  A.    We did.

17  Q.    How much money did --

18          MS. GINSBERG:  Your Honor, I'm going to object.

19  There's been a lot of overlapping of testimony between Classy

20  and DMV Indies.  The indictment does not allege that Mr. Asuen

21  was an active participant in Indies in any substantial way.  I

22  think there's one passing reference that they shared resources,

23  and this is -- we've gone pretty far trying to compare the two.

24          THE COURT:  You know, I understand that this is a

25  broad conspiracy, but, Ms. Pedersen, the questions so far

Defilippis - Direct                                                      8

1    haven't been real helpful in terms of me determining detention.

2             MS. PEDERSEN:  Sure, Your Honor, I'll get --

3             THE COURT:  So why don't we move on to things that

4    pertain more to detention.

5             MS. PEDERSEN:  Sure.

6    Q.    Last week, did the agents execute a search warrant at the

7    defendant's residence?

8    A.    They did.

9    Q.    What, if anything, was found?

10   A.    They -- I believe they found cash, U.S. currency as well

11   as foreign currency, a number of watches.  They found an

12   application -- a prostitution-type application that was being

13   used in the business, some credit cards, I believe.

14   Q.    Did they find any accounts for foreign banks?

15   A.    They did.

16   Q.    Do you remember what bank?

17   A.    I want to say it was a bank -- Bank of Africa, maybe Bank

18   of South Africa.  I'm not sure.

19   Q.    Okay.  And were there any other physical items taken from

20   the search?

21   A.    Yes.

22   Q.    Were there any weapons?

23   A.    There was a pellet gun that was taken from the residence.

24   Q.    Okay.  You have in front of you what I've marked as

25   Government Exhibit 1.  Is that a photograph of the pellet gun

Defilippis - Direct                                                    9

1    that was seized?

2    A.    Yes.

3          MS. PEDERSEN:  Okay.  With the assistance of the

4    court security officer, I'd like to present that to the Court.

5    I've presented a copy to defense counsel.  I'd like to publish

6    and introduce it at this time, Your Honor.

7          THE COURT:  All right, is there a -- is that the

8    dangerous weapon that's referred to in Count 5, or is that

9    something in addition to this?

10         MS. PEDERSEN:  Well, Your Honor, this is a weapon

11   that was seized from the defendant's residence.

12         THE COURT:  No, I know.  I'm just trying to figure

13   out is that the weapon that's referred to as in Count 5?

14         MS. PEDERSEN:  It's not clear at this point whether

15   or not it is or is not.

16         THE COURT:  Okay.  Go ahead.

17         MS. PEDERSEN:  Okay.

18   Q.    Did the defendant make any statements to any

19   coconspirators that he owned property overseas?

20   A.    He did.

21   Q.    And what was the nature of that statement?

22   A.    He, he -- a cooperator of ours, referred to, I believe, as

23   UCC-1 in the indictment, told us that he had overheard a

24   conversation whereby Mr. Asuen and Mr. Akuiyibo owned property,

25   I believe real estate in Lagos.

1    Q.   In Nigeria?

2    A.   In Nigeria.

3    Q.   Okay.  Did you discover any evidence that the defendant

4    was self-employed as either a commodities trader or in the

5    import and export of cars?

6    A.   No.

7    Q.   Now, during the investigation, you interviewed an

8    individual that's described in the indictment as UCC-1.  Did

9    that individual provide information to you that he had been

10   assaulted and attacked by the defendant Akuiyibo and was aided

11   and abetted by the defendant Asuen?

12   A.   Yes, he did.

13             MS. GINSBERG:  Objection, Your Honor.  The term

14   "aided and abetted" is the government's words.  It's a legal

15   term, and it's not helpful, I don't think, to the Court.

16             THE COURT:  Objection sustained.  Describe what

17   happened.

18   BY MS. PEDERSEN:

19   Q.   I'll let you describe what the individual explained to

20   you.

21   A.   UCC-1 explained to us that in approximately September --

22   initially it was July but then later found records to indicate

23   that it was September -- of 2010, he was asked by Mr. Akuiyibo

24   to come see him, Akuiyibo, at his Senate Square, Senate Square

25   apartment, which was leased by Mr. Akuiyibo's girlfriend at the

Defilippis - Direct                                                    11

1    time.  So UCC-1 went over to the apartment, which was located

2    in D.C.  When he arrived, he explained to us that Mr. Akuiyibo

3    was there as well as Mr. Asuen.

4            At some point, Mr. Akuiyibo started to question UCC-1

5    about a potential rival business and his discussions with one

6    of Mr. Akuiyibo's prostitutes who were working for him.  At

7    some point, Mr. Akuiyibo began punching UCC-1 in the face, as

8    he describes it, and then during that altercation, at some

9    point, Mr. Akuiyibo brandished a weapon, did not point it at

10   UCC-1 according to UCC-1 but did brandish a weapon, and at some

11   point during that conversation, he continued to be beaten up

12   and whipped with a power cord for a computer or something like

13   that.

14           He states that as he was being beaten, Mr. Asuen made

15   a couple comments to him such as, "You're lucky you're not a

16   regular dude, or you'd be in the trunk of a car," and he had

17   made a reference to the fact that, that he had been ripped off

18   from a prior business relationship that they had had.

19   Q.   That "he" referring to whom?  I'm sorry.

20   A.   That UCC-1 had had a prior business relationship with

21   Mr. Asuen and Mr. Akuiyibo.

22   Q.   And that they believed that the UCC-1 had ripped them off?

23   A.   Yes.

24   Q.   Okay.  Did the UCC-1 suffer any additional injuries during

25   this attack?

Defilippis - Direct                                                12

1    A.    UCC-1 tells us the battery pack or some part of the

2    battery pack hit him in the ear and he had hearing loss.  He

3    was bleeding from his ear, and he was swollen in the face, and

4    he also had whipping marks or scars on his arm.

5    Q.    Did UCC-1 describe the gun that was brandished during the

6    attack?

7    A.    I had asked UCC-1 to provide for us something similar, a

8    replica of the type of gun that he saw Mr. Akuiyibo brandish,

9    and he did provide a copy of that to me.

10   Q.    And have you had occasion to compare the copy provided by

11   UCC-1 with the pellet gun that was seized from the defendant's

12   residence?

13   A.    I have.

14   Q.    Okay.  And in your opinion, how do they compare?

15   A.    They are similar.

16   Q.    Did UCC-1 indicate that there was any further activity

17   with regards to the weapon that he described?  You said -- you

18   indicated it wasn't pointed at him.  Is that correct?

19   A.    That's correct.

20   Q.    Was there any other action taken with regard to the gun?

21   A.    With regard to the gun, I'm not aware of any.  UCC-1

22   didn't speak of any other action with that gun.

23   Q.    Did he indicate whether or not that someone had tried to

24   rack the gun in his presence?

25   A.    He did say at some point -- UCC-1 said at some point that

Defilippis - Direct                                                    13

1    Mr. Akuiyibo grabbed the top of the gun, which to us would

2    indicate there was some sort of racking or attempting to rack

3    the gun.

4    Q.   Do you know if there was any other witness either to the

5    event or to the events immediately after this attack?

6    A.   We interviewed another witness, who I believe is referred

7    to as witness A in the indictment, who worked as a prostitute

8    for Classy, and she confirmed the statements that UCC-1 had

9    made to us, saying that she had met with UCC-1 after the

10   beating and the UCC-1 explained to her what had happened during

11   that beating, and she had also said to us that when she met

12   with UCC-1, he was -- he had a black eye and, I think, a

13   swollen lip at the time.

14   Q.   Did law enforcement search any of the four residences

15   associated with defendant Akuiyibo?

16   A.   We did.

17   Q.   Did you search his cars as well?

18   A.   We did.

19   Q.   Did you ever recover either a firearm or a pellet gun?

20   A.   We did not.

21   Q.   During the investigation, did Montgomery County conduct a

22   state search warrant on e-mail accounts used by the defendant?

23   A.   They did.

24   Q.   Did you review one of the accounts -- I'm sorry, did you

25   review an e-mail from 2009 from Model Elite?

Defilippis - Direct                                              14

1    A.    I did.

2    Q.    Was that e-mail to Classy DC Escorts?

3    A.    Yes.

4    Q.    And did it concern the use of violence against some of

5    their girls?

6    A.    It does.

7              MS. PEDERSEN:  I've already provided a copy to

8    counsel.  I'd like to provide a copy to the Court.

9    Q.    Agent, if you look at Government Exhibit 2, is that a true

10   and accurate copy of an e-mail that was obtained pursuant to

11   one of the search warrants?

12   A.    It is.

13             MS. PEDERSEN:  I'd like to introduce Government's

14   Exhibit 2 at this point.  I'd ask the agent to read the e-mail

15   briefly.  This is just for the Court.

16             THE COURT:  Any objection to Exhibit 2?  It's

17   admitted.

18             (Government's Exhibit No. 2 was received in

19   evidence.)

20   BY MS. PEDERSEN:

21   Q.    Go ahead, you may read.

22   A.    It's from Model Elite, dated Friday, July 24, 2009.

23   "Subject:  Must see.  Here is why chicks should always get

24   slapped when you run away.  Chicks that have worked for us all

25   on a site in Philly.  Links to Mandy, Classy, Inga, Elite,

1    Briana, Prime, and so on.  Enjoy."

2              MS. PEDERSEN:  Your Honor, I have no further evidence

3    at this time.

4              THE COURT:  Okay.  Cross-examination?

5                        CROSS-EXAMINATION

6    BY MS. GINSBERG:

7    Q.   Agent, for what period of time was Mr. Asuen under

8    investigation?

9    A.   The entire time.

10   Q.   Which is approximately how long?

11   A.   Our investigation started in about April of last year.

12   Q.   Last year.  So April of 2011 or '10?

13   A.   2011.  Prior to that, Montgomery County had initiated the

14   investigation.

15   Q.   And was Mr. Asuen a target of that investigation as well?

16   A.   He was.

17   Q.   Okay.  So altogether, how long was Mr. Asuen under the

18   investigation of either Montgomery County or the FBI?

19   A.   Since about December of 2010.

20   Q.   Okay.  And was he the subject of surveillance at any

21   point?

22   A.   Not physical surveillance, no.

23   Q.   Was he the subject of wiretaps or any other type of

24   surveillance?

25   A.   He was the subject of consensual recordings, electronic

1    surveillance.

2    Q.    Okay.  And you know from those consensual recordings and

3    from your investigation that Mr. Asuen and Mr. Akuiyibo really

4    ran two separate operations, correct?

5    A.    That's correct.

6    Q.    And their monies were not commingled in any way?

7    A.    Not that we could see.

8    Q.    Okay.  But you've -- and you've examined bank accounts for

9    each of these individuals?

10   A.    Not myself personally, but our financial analysts have.

11   Q.    Okay.  And you've interviewed a number of people who were

12   involved either in the operations of these two businesses or

13   the financial -- the collecting of money in these businesses,

14   and with the exception of potential -- of maybe sharing,

15   occasionally sharing the use of the same person to do an

16   isolated event, the operations were separate?

17   A.    That -- can, can you restate that?

18   Q.    Sorry.  That was kind of long-winded.

19          With a few exceptions, the people that worked for

20   Mr. Akuiyibo were separate from the people that worked for

21   Mr. Asuen?

22   A.    With a few exceptions, that's correct.

23   Q.    Okay.  And in all of your investigation, including the

24   arrests of individuals who worked -- claimed to have worked as

25   prostitutes for Mr. Asuen, did you ever learn at any time that

1   Mr. Asuen had made a threat or taken any aggressive action

2   towards anyone?

3   A.   Not from the police reports that, that we reviewed.  The

4   FBI had not arrested any associates or any prostitutes working

5   for DMV.  Fairfax had, but there was no indication in their

6   reporting.

7   Q.   Okay.  And you said that you had executed a search warrant

8   for e-mail accounts used by Mr. Asuen?

9   A.   Montgomery County did that.

10  Q.   And I assume you're familiar with the contents of what was

11  produced?

12  A.   Some of which I am, yes.

13  Q.   Okay.  And with the exception of this one e-mail, which is

14  sent to Mr. Akuiyibo saying that chicks should get slapped when

15  they run away, you are unaware of any statement in any e-mail

16  by Mr. Asuen that indicated he was engaged in any act of

17  violence whatsoever towards the escorts that were working for

18  him?

19  A.   I, I haven't had the opportunity to review the entire

20  contents of those, those search warrants that were executed by

21  Montgomery County, so I wouldn't be able to say if there's

22  other types of content like this out there.  This is, this is

23  the one that I'm aware of.

24  Q.   But presumably in preparation for this hearing, you

25  prepared yourself to inform the Court about any acts of

Defilippis - Cross                                          18

1   violence or threats of violence by Mr. Asuen that was known

2   either to you or Montgomery County or anybody involved in the

3   investigation?

4   A.   That's correct.

5   Q.   And this is, this is the only such indication?

6   A.   That we have now, correct.

7   Q.   Okay.  And -- now, with, with respect --

8          THE COURT:  Ms. Ginsberg, I don't mean to interrupt

9   you, and I'll give you all the time you want.  I've got a

10  little problem that I've got to be downstairs, it's a command

11  performance, in about five minutes, and if you think you're

12  going to be longer than that, we could stop and come back.  I

13  don't have to -- I can come back up by 3:30, but I don't want

14  to -- I don't want to cut you off --

15         MS. GINSBERG:  Yeah.

16         THE COURT:  -- but on the same hand, I can't be late.

17         MS. GINSBERG:  I think there'll be -- it will take us

18  more than five minutes to conclude this hearing altogether, so

19  maybe we should just --

20         THE COURT:  Do you think it will take more than five?

21  I've got to be down --

22         MS. GINSBERG:  Well, Your Honor, the government is

23  arguing for detention.  We have a number of arguments -- aside

24  from the evidence a number of arguments against that.

25         THE COURT:  I'd feel better, if you don't mind, if we

1    could recess, and I'll --

2            MS. GINSBERG:  That's fine, Your Honor.

3            THE COURT:  Now, wait a minute.  Are you almost --

4    you've got a lot more questions for him, don't you?

5            MS. GINSBERG:  I still have more questions.  Probably

6    more than five minutes.

7            THE COURT:  Okay.  Then I'm going to just go ahead

8    and take a break now, because I don't want to be late, and I'll

9    come back up here as soon as I can.  They tell me it will be

10   done by 3:30, and I'll come up as quickly as I can.

11           MS. GINSBERG:  We'll be waiting.

12           THE COURT:  Okay.

13           MS. GINSBERG:  Thank you.

14           THE COURT:  Thank you.  Sorry about that.

15              (Recess from 3:03 p.m., until 3:45 p.m.)

16                          (Defendant present.)

17           THE COURT:  All right, let's continue.

18           MS. GINSBERG:  All right.

19   Q.   Okay, Agent, let me just see if I can get back to -- you

20   were, previously testified that the bank information, that

21   Mr. Asuen's bank accounts were -- a search warrant was executed

22   and you have his bank records?

23   A.   We obtained his bank records pursuant to a federal grand

24   jury subpoena.

25   Q.   Okay.  And you said they were analyzed; is that correct?

Defilippis - Cross                                                        20

1   A.   That's correct.

2   Q.   All right.  And is it not correct that substantially --

3   that the funds that were the proceeds of this escort business

4   were deposited by Mr. Asuen into a number of, essentially two

5   bank accounts?

6   A.   From our understanding, the prostitution proceeds went

7   into a number of bank accounts either in Mr. Asuen's name or

8   his brother's.

9   Q.   Okay.  And you have no indication that his brother knew

10  how -- what he was using these accounts for, do you?

11  A.   Not as of right now, no.

12  Q.   Okay.  And is it also your understanding that essentially

13  the monies were, they were put into the bank accounts, as

14  opposed to being stored someplace else?

15  A.   That we're not fully aware of.  I believe -- we believe

16  some of the proceeds were put into the accounts, but we're not

17  sure how much of the total was put into the accounts.

18  Q.   Well, you said that someone has analyzed these bank

19  accounts, correct?

20  A.   Correct.

21  Q.   And you have some rough estimate of at least at this point

22  what you believe is the amount of money that was being taken in

23  on a nightly or a weekly basis; is that correct?

24  A.   That's correct.  For Mr. Akuiyibo, we do.

25  Q.   All right.  Well, you don't have that for Mr. Asuen?

1   A.   Not as of yet, correct.

2   Q.   Okay.  As far as the information you do have, though, from

3   the people who were collecting the money is that the monies

4   were deposited into a bank account?

5   A.   At least a portion of them were, yes.

6   Q.   Okay.  And you have -- in the time that you've been

7   investigating Mr. Asuen, you have no information that would

8   substantiate the conclusion that he was storing money someplace

9   else?

10  A.   We have not found assets elsewhere.

11  Q.   And you have looked?

12  A.   We have looked domestically, yes.

13  Q.   Okay.  And in fact, you said that you found evidence of a

14  foreign bank account when you searched his apartment?

15  A.   Pursuant to the search warrant, there was either a bank

16  account or a checkbook found that had the foreign bank account

17  from Africa.

18  Q.   Okay.  And did you make any effort to determine if any

19  funds were being held in that account?

20  A.   Not as of yet.  We conducted the search late last week.

21  Q.   All right.  But what you -- when you found -- what you

22  found was like a checkbook essentially?

23  A.   I couldn't tell you that, ma'am, because I wasn't there,

24  and I haven't reviewed all of the evidence yet.  My

25  understanding from the property receipts were I believe that

1    it's a checkbook.

2    Q.    Okay.  So you wouldn't know that, whether or not it was

3    like a starter, the checkbook that you get when you start an

4    account?

5    A.    I wouldn't know that right now.

6    Q.    All right.  You don't know how many checks, if any, were

7    written off of this account?

8    A.    I don't.

9    Q.    Or any deposits were made into the account --

10   A.    I wouldn't --

11   Q.    -- except that the account existed?

12   A.    That's correct.

13   Q.    Okay.  And with respect to the unindicted coconspirator

14   statement that he heard some discussion about property being

15   owned by -- did you say Mr. Asuen or Mr. Asuen and

16   Mr. Akuiyibo?

17   A.    Both.

18   Q.    Both together?

19         Did you make any effort to determine whether that was

20   accurate?

21   A.    I, I did reach out to our legal attaché in that area, so

22   we're, we're currently looking into that.

23   Q.    All right.  But you have no information that, at this

24   point that that information was -- that the unindicted

25   coconspirator was accurate?

1    A.    Not as of yet.

2    Q.    Okay.  And you did seize Mr. Asuen's passports; is that

3    correct?

4    A.    That's correct.

5    Q.    One was a U.S. passport, and one is a Nigerian passport,

6    correct?

7    A.    I believe that's correct.

8    Q.    And he is a dual citizen?

9    A.    That I don't know.

10   Q.    You do know he is a U.S. citizen?

11   A.    Yes.  I believe he's a naturalized U.S. citizen.

12   Q.    Okay.  And did you look in these passports to determine

13   his -- the places he's traveled to?

14   A.    Not as of yet.

15   Q.    So if he went -- and you, you don't have -- as you sit

16   here today, you don't know in the last several years if, if

17   he's spent any time in Nigeria?

18   A.    Well, we do have some travel records that indicate that he

19   did travel overseas, but I don't have those records in front of

20   me now.  I believe there was at least one trip that he had

21   taken to Nigeria.

22   Q.    Okay.  And in fact, the unindicted coconspirator told you

23   about a trip that Mr. Asuen and his girlfriend and Mr. Akuiyibo

24   and his girlfriend took that included a visit to Nigeria?

25   A.    Yes.

Defilippis - Cross                                                    24

1    Q.   And were you aware that that -- that the amount of time

2    that they spent in Nigeria was four days?

3    A.   I'm not aware of that as of right now.

4    Q.   Okay.  Do you have any information other than the fact

5    that the unindicted coconspirator said that the four of them

6    made a trip sometime in the last year or so?

7    A.   We have travel records that show the four of them

8    traveling to Las Vegas.

9    Q.   Okay.  But as far -- do you have travel records, any other

10   travel records indicating foreign travel by Mr. Asuen?

11   A.   I'd have to review those travel records, but other than

12   that, no, we don't.

13   Q.   Now, the, the pellet gun -- am I correct the gun that was

14   seized from Mr. Asuen's apartment during the search was

15   essentially a pellet gun?

16   A.   Yes, it was a pellet gun.

17   Q.   Okay.  And it was found in a shoebox or in some sort of a

18   box in a closet in his apartment?

19   A.   I was told it was found in a closet.

20   Q.   Okay.  Did anyone tell you there was any, any pellets or

21   whatever the appropriate kind of ammunition is that you put in

22   a pellet gun?

23   A.   No one said that to me, and when I physically saw the gun,

24   there was nothing in it.

25   Q.   Okay.  Did you ask -- Mr., Mr. Asuen's girlfriend was

Defilippis - Cross                                                          25

1    present at the apartment when you and the other agents arrived

2    to do the search; is that correct?

3    A.    I wasn't present --

4    Q.    Oh, sorry.

5    A.    -- but I was told by other agents that she was there and

6    interviewed.

7    Q.    And was she interviewed about this pellet gun?

8    A.    I don't believe they asked her about that.

9    Q.    Okay.  And did, did she indicate to any of these other

10   agents that she had ever observed Mr. Asuen behave in a way

11   that was aggressive or violent towards anybody?

12   A.    No.  And she wasn't asked.

13   Q.    She wasn't asked that?

14   A.    I don't believe so.

15   Q.    So that was not a concern of the agents?  Actually, I

16   withdraw the question.  You weren't there.

17         But did you give the agents any instructions with

18   respect to the way they would execute the search warrant or

19   question anybody they found present in the apartment?

20   A.    They were just told to, you know, execute the search

21   warrant as we typically do and then interview anyone that was

22   found in the apartment --

23   Q.    Okay.

24   A.    -- but there was no set interview primers that I gave

25   them, no.

Defilippis - Cross                                                          26

1    Q.   Okay.  So it's fair to say that you were not concerned

2    that Mr. Asuen would behave in a, in a violent way?

3    A.   I wouldn't say that.  I knew that the agents that were

4    there taking care of it would be able to handle any, any kind

5    of problems they ran into.

6    Q.   But, in fact, they didn't run into any kind of problems

7    whatsoever?

8    A.   Not that I'm aware of.

9    Q.   Okay.  Now, with respect to this -- to the beatings that

10   the unindicted coconspirator experienced, the beating that you

11   described was not the first beating that he received from

12   Mr. Akuiyibo; isn't that correct?

13   A.   That's correct according to what he told us.

14   Q.   Okay.  And the -- at least -- he told you about a beating

15   that occurred in January of 2010 approximately?

16   A.   That's correct.

17   Q.   And Mr. Asuen was nowhere near that incident, correct?

18   A.   That's correct.

19   Q.   Was anybody else involved in that incident?

20   A.   There was another individual.

21   Q.   And that was Mr. Akuiyibo's brother?

22   A.   No.

23   Q.   No.  But are you then aware of yet another incident in

24   April of 2010 where the unindicted coconspirator was beaten up

25   either by Mr. Akuiyibo or his -- Mr. Akuiyibo's brother?

Defilippis - Cross                                                        27

1    A.    We were told by the unindicted coconspirator that he was,

2    that he was beat up by Mr. Akuiyibo's brother.

3    Q.    Okay.  And then, in fact, the incident that you did

4    describe, it was -- the unindicted coconspirator, in fact, was,

5    had, had taken some steps to try and break away from

6    Mr., Mr. Akuiyibo's business; is that correct?

7    A.    He told us he was trying to step away from doing

8    collections; that's correct.

9    Q.    For Mr. Akuiyibo?

10   A.    For Mr. Akuiyibo and I believe for anyone else he was

11   doing collections for, but primarily for Mr. Akuiyibo.

12   Q.    But he told you that he was planning -- he and one of the

13   women who had worked for Mr. Akuiyibo were trying to get away

14   from Classy so that the unindicted coconspirator and this other

15   woman could start their own business?

16   A.    That's what he told us, correct.

17   Q.    Okay.  And he, he told you that he believed that this

18   other woman mentioned her plans or their plans to one of the

19   men who was paying for her service and that that information

20   got back to Mr. Akuiyibo?

21   A.    Yeah.  Initially, they believed -- or he believed that --

22   the unindicted coconspirator believed it got back that way.

23   Recently, UCC-1 believed that it was pursuant to an e-mail that

24   involved the same witness, that it got back somehow, maybe

25   through another -- through one of the other women that were

Defilippis - Cross                                                    28

1    working for Classy at the time.

2    Q.    Okay.  And just so that I -- I just want to be clear about

3    this:  He -- the unindicted coconspirator told you that he and

4    this woman, that they were planning to get away from Classy so

5    that the two of them could have their own business?

6    A.    That's what he told us, yes.

7    Q.    Okay.  And he told you that when he arrived at the -- he

8    was asked by Mr. Akuiyibo to come to Mr. Akuiyibo's apartment

9    in, in the building where he lived in, in D.C.?

10   A.    He was told to come to Mr. Akuiyibo's girlfriend's.

11   Q.    All right.  And Mr. Akuiyibo was living with his

12   girlfriend at that time in that apartment?

13   A.    Yeah.  He was between there and another location, correct.

14   Q.    And is it also true that, that Mr. Asuen had his own

15   apartment in that same apartment building?

16   A.    Yes.

17   Q.    And the unindicted coconspirator described the, the

18   beating he received.  The, the only person who laid any hand on

19   him according to the unindicted coconspirator was Mr. Akuiyibo?

20   A.    Yes, correct.  He said that Mr. Asuen did not, did not hit

21   him.

22   Q.    All right.  And you interviewed him on several -- at least

23   two occasions where you discussed this incident with him; is

24   that correct?

25   A.    That's correct.

Defilippis - Cross                                              29

1  Q.    And you made notes, which Ms. Pedersen has kindly provided

2  to me, and I assume that those notes reflect the important

3  aspects of what the unindicted coconspirator told you about

4  that incident?

5  A.    They do.

6  Q.    Okay.  And is it not correct then that the unindicted

7  coconspirator described the beating and then told you that

8  after the beating was over, Mr. Asuen made a comment to him,

9  something to the effect of what you testified previously?

10  A.    Yeah.  The timing on it when we initially debriefed him,

11  it kind of changed a little bit.  At some point -- my

12  understanding at some point is when Mr. Asuen had made comments

13  to, to the unindicted coconspirator, so it's, it's either

14  during, during the altercation with Mr. Akuiyibo or right

15  after.

16  Q.    All right.  But if you, if you wrote here that

17  Mr. Akuiyibo beat him with his hands and, and a power cord and

18  pulled out a gun and that after the beating, the unindicted

19  coconspirator was able to walk but he was bleeding, and then

20  Mr. Asuen told him he was lucky that he wasn't just a regular

21  dude or he would be in the trunk, so it's -- a fair

22  interpretation of these notes is that the beating had stopped

23  and the unindicted coconspirator was clearly injured, and it

24  was after the beating had stopped that he -- he relays that

25  after the beating stopped, Mr. Asuen made this comment to him?

Defilippis - Cross                                                    30

1    A.    That's correct.  At the time that we debriefed him, that's

2    what he had said.

3    Q.    Okay.  And then when you debriefed him again on -- in

4    September, when he describes the beating, he told you that

5    immediately following the beating, that Mr. Akuiyibo looked

6    through his phone and computer, threw the phone -- or threw the

7    computer, I guess, on the floor or against the wall or

8    something, and then at that point, Mr. Asuen told him that

9    Mr. Akuiyibo -- it was a good thing Mr. Akuiyibo had

10   essentially gone to New York to cool off and it could have been

11   worse, but again, a fair interpretation of what he told you is

12   that those -- that particular comment was made after the

13   beating had stopped?

14   A.    Yeah.  That's what he told us at the time.

15   Q.    Okay.  And he also told you that he had seen what he

16   thought was this, the gun that was displayed during the beating

17   on at least one if not two occasions in Mr., in Mr. Akuiyibo's

18   girlfriend's apartment?

19   A.    I'm aware of at least on one occasion that the unindicted

20   coconspirator saw that, saw that weapon, that gun at the Senate

21   Square apartment.

22   Q.    In a drawer in Mr. Akuiyibo's girlfriend's apartment?

23   A.    No, I think that's -- it's the other -- they had a --

24   Mr. Akuiyibo --

25   Q.    Or at an apartment on First Street?

1   A.   Yes, in D.C.  Yeah, that was the -- he saw it there as

2   well.

3   Q.   Okay.

4   A.   That's what you're referring to.

5   Q.   All right.  But he saw the gun that he believed was the

6   same gun that was brandished during the beating?

7   A.   That's correct.

8   Q.   And that was Mr. Akuiyibo's apartment, not, not in

9   Mr. Asuen's apartment?

10  A.   Initially, he saw it at the D.C. house and then saw it at

11  the Senate Square apartment.

12  Q.   And just lastly, you said that you saw some foreign

13  currency in Mr. Asuen's apartment?

14  A.   I did not, but the agents who searched it did.

15  Q.   The agents did?

16  A.   Yes.

17  Q.   And those were dinars, Iraqi currency?

18  A.   There was some Iraqi currency.  I think there was some

19  currency from Hong Kong or China.

20  Q.   But essentially small amounts of currency?

21  A.   I don't know what, what the translation was to U.S.

22  currency, so I'm not really sure how much it equated to.

23          MS. GINSBERG:  Okay.  I don't have any other

24  questions.

25          THE COURT:  Okay.  Redirect?

Defilippis - Redirect                                              32

1            MS. PEDERSEN:  I just have a few questions for

2    clarification.

3                        REDIRECT EXAMINATION

4    BY MS. PEDERSEN:

5    Q.   At the time of this beating in September of 2010, was the

6    unindicted coconspirator also making money collections for the

7    defendant?

8    A.   I believe he made collections for Mr. Asuen up through

9    April.

10   Q.   Of 2011?

11   A.   Of 2011.

12           MS. PEDERSEN:  Okay.  No further questions, Your

13   Honor.

14           THE COURT:  Okay.  Thank you.  You can step down.

15           THE WITNESS:  Thank you, Your Honor.

16                        (Witness excused.)

17           THE COURT:  Any other government witnesses?

18           MS. PEDERSEN:  No, Your Honor.

19           THE COURT:  All right.  Ms. Pedersen, do you have

20   argument?

21           MS. PEDERSEN:  Yes, I do, Your Honor.  Your Honor, in

22   this case, under 18 U.S.C. 3142(C)(3), the defendant has been

23   charged in an indictment with a violation of 18 U.S.C. 924(c),

24   which is a crime of violence, and the bail release -- I'm

25   sorry, the Bail Reform Act indicates that subject to rebuttal

33

1    by the defendant, it shall be presumed that no condition or

2    combination of conditions will reasonably assure his appearance

3    as required and the safety of the community if the officer --

4    if the judicial officer finds probable cause to believe that

5    the person committed the offense.

6          Here the grand jury has already found probable cause

7    that the defendant participated in that offense, and the

8    probable cause was found by the grand jury and returned in the

9    indictment.

10          In this case, there is no condition or combination of

11    conditions to assure his appearance and the safety of the

12    community.  I'd just like to point the Court to some facts that

13    have been noted in the Pretrial Services report.  The defendant

14    has used alternative names and dates of birth.  He has

15    documented foreign travel to Nigeria, London, St. Barts, China.

16    There is conflicting statements both from himself and his

17    girlfriend concerning the nature of the travel.

18          There's conflicting statements by himself regarding

19    his own employment and his source of income.  He told Pretrial

20    Services he was self-employed as a commodities trader and also

21    in the import and export of cars.  There is no evidence found

22    of that during the search of his residence and certainly no

23    evidence of that during a review of his bank accounts.

24          The defendant doesn't have any significant ties to

25    this area or to the Eastern District of Virginia.  He doesn't

34

1  have a wife or any children, and he doesn't own a home here.

2  He has a girlfriend of four years with whom he was residing,

3  but Pretrial didn't find her suitable due to her lack of

4  cooperation and lack of candor.

5       His own family members have been deemed uncooperative

6  and unsuitable as third-party custodians, and they've proposed

7  a third-party custodian who really doesn't appear to have any

8  incentive to either supervise him or prevent his flight if he

9  were to deem that's what he wanted to do.

10      The defendant has family in Nigeria.  There's

11  indications that he has a bank account in Africa and perhaps

12  property in Nigeria.  There is -- he has access to unknown

13  amounts of cash.  There's certainly foreign currency that was

14  taken, which corroborates the foreign travel, and he's used

15  multiple bank accounts both in his name and the name of his

16  brothers.

17      You know, they did find a pellet gun in his

18  residence.  There is an indication from the e-mail that was

19  presented to the Court about his participation in violence or

20  at least a discussion of willingness to discuss violence

21  against women that were working as escorts or prostitutes for

22  his agency.

23      So all of these factors and the totality of the

24  strength of the government's case, that the government argues

25  there is no condition or combination of conditions that should

35

1   assure the Court of his appearance and the safety of the

2   community.

3           THE COURT:  All right, thank you.

4           Ms. Ginsberg?

5           MS. GINSBERG:  Your Honor, maybe I'll begin with the

6   strength of the government's case.  Mr. Asuen's name appears in

7   two paragraphs in the indictment, in the -- one in the general

8   allegations and one in the one overt act in Count 2, which is

9   the conspiracy count that he's named in other than the three

10  counts relating to this beating of the unindicted

11  coconspirator.

12          So I, I would submit that the indictment itself is

13  ample evidence that there is not a lot of evidence of

14  Mr. Asuen's conduct with respect to this conspiracy, and if, if

15  there were, that he would -- we would be seeing a great deal

16  more of it in the indictment.  The Court heard the cases of the

17  two women who were coconspirators, and their names and their

18  activities are numerous throughout the indictment.

19          And with respect to this incident, with the beating

20  of the coconspirator, Your Honor, I just think that the

21  allegations in the, in the three counts are very unspecific as

22  to what the government claims he did.  I think the evidence

23  from the agent's testimony at best is that he was present

24  during this beating and that he made one or two comments to the

25  unindicted coconspirator after the beating stopped.

36

1          There is absolutely no indication in any statement

2     from the unindicted coconspirator that Mr. Asuen took part in

3     that beating in any fashion whatsoever or that he felt

4     threatened by Mr. Asuen, notwithstanding the fact that he was

5     there.

6          And, Your Honor, mere presence at the scene of an

7     offense is certainly insufficient to establish guilt beyond a

8     reasonable doubt.  It should not be sufficient -- a sufficient

9     basis to deny bond in, in this case.

10         The government does have access to Mr. Asuen's bank

11     records.  If they -- I would suggest if they believed that

12     there was unaccounted for proceeds, somebody would have looked

13     at those accounts and said, well, look, we know how much was

14     being collected every day.  This is how much was deposited into

15     those accounts, and this is how much we can't account for.

16     There was no evidence of that nature.

17         There's no concrete evidence of any kind of travel by

18     Mr. Asuen for any purpose other than vacation traveling.  I

19     would represent to the Court that if the passport was -- were

20     looked at, Mr. Asuen spent a total of four days in Nigeria

21     visiting during the Christmas holiday, and that was the travel

22     that was referred to by the, by the government.

23         Mr. Asuen has -- is a naturalized citizen.  He --

24     prior to losing his employment at Swidler & Berlin, he's a,

25     he's a computer, he's a computer person, and he has a degree

1   from the University of Maryland in programming or information

2   technology.  He worked at a -- during the time he was a

3   full-time student, he had what was almost a full-time job at a

4   company where he was programming codes for equipment that was

5   used at airports.

6        He then went to work for a company that was an

7   international development consulting firm called Chemonics

8   International that had contracts with USAID and went to work at

9   Swidler & Berlin in their IT department and lost his job when

10  the law firm merged with Bingham McCutchen and they had -- they

11  didn't have the need for the kind of work he was doing, because

12  they had other staff from the, from the larger law firm, and it

13  was at that point that he started doing some business with --

14  trying to trade.  Your Honor, I think that the dinars that were

15  found in the apartment are consistent with him doing some

16  trading.

17       He did attempt to start a business where he was

18  exporting vehicles overseas.  It never went anywhere, and

19  unfortunately, he met up with Mr. Akuiyibo and made some very

20  bad choices, but at this point, I think that there are numerous

21  conditions that could assure his appearance.

22       His -- almost all of his family is in the United

23  States.  Most of -- they, they won the lottery, and that's how

24  they got here.  They're naturalized citizens.  Several of them

25  live in New Jersey with his mother.  He's -- from my

38

1    discussions with several of his sisters, he maintains almost

2    daily contact with many of his siblings and has been in the

3    D.C. area since he came here to go to college at the University

4    of Maryland.

5         The individual who is -- has been approved by

6    Pretrial as a third-party custodian is a long-time friend of

7    Mr. Akuiyibo -- of Mr. Asuen's. He has no criminal record.

8    He, he works for a not-for-profit company in the District and

9    has assured me that he's willing to take on the obligations of

10   a third-party custodian.

11        If the Court think it's necessary, it certainly has

12   GPS monitoring available, and I think the Court can fashion a

13   number of conditions that would assure his appearance.

14        THE COURT:  All right, thank you, Ms. Ginsberg.

15        You know, I have to agree that his name is not as --

16   in this indictment as much as Ms. Opuiyo, and frankly, I was

17   not going to release Ms. Opuiyo but for the representation that

18   she'd be living with a U.S. marshal subject to approval by

19   Pretrial Services. I don't think that this proposed conditions

20   of release would have the same level of comfort to me that

21   Ms. Opuiyo did, and I hope I'm not wrong about that one.

22        I'm further concerned about the fact that although

23   perhaps he didn't himself beat the UCC, he was, I think, at

24   least complicit in that according to the testimony of the

25   agent, and they did find this pellet gun at his home. Whether

1    it's the same one or not, you know, I don't know, but it seems

2    as though it certainly might have been.

3            I have no confidence in this third-party custodian,

4    certainly not on the same level as the third-party custodian

5    that Ms. Opuiyo had, and he doesn't have any family around

6    here, none who are apparently cooperative.  And it does appear

7    to me that he was not being up front with Pretrial Services

8    about his employment.  Neither was his girlfriend, and I don't

9    think here that he has overcome the presumption given what I've

10   seen so far.

11           So as I said, I don't feel comfortable with this

12   third-party custodian, and I'm not sure I'd release him anyway

13   given that, as I said, the incident with the UCC.  So I find

14   that the defendant is a danger to the community and a risk of

15   flight, and I'm going to order that he be detained pending

16   trial.  He's remanded to the custody of the marshal.

17                         (Which were all the proceedings

18                          had at this time.)

19

20                   CERTIFICATE OF THE TRANSCRIBER

21       I certify that the foregoing is a correct transcript from

22   the official electronic sound recording of the proceedings in

23   the above-entitled matter.

24

25                         _____
                                    /s/
                           Anneliese J. Thomson