UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 1:12CR0038-03 |
| v. ) | |
| ) | The Honorable Leonie M. Brinkema |
| OTASAWIE CHRISTOPHER ASUEN, ) | |
| ) | Sentencing:  August 31, 2012 |
| Defendant. ) | |

## **DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

COMES NOW the defendant, OTASAWIE CHRISTOPHER ASUEN, by counsel and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("USSG"), respectfully submits his position with respect to sentencing.

   I.   **MR. ASUEN'S SENTENCING GUIDELINES**

On June 6, 2012, Mr. Asuen pled guilty to one count of Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)) and one count of Conspiracy to Travel/Use Interstate Facilities in Aid of a Racketeering Enterprise (18 U.S.C. § 1952 and § 371).  The U.S. Probation Officer calculated Mr. Asuen's guidelines as a level of 18 on the money laundering conspiracy which involved financial transactions traceable to DMV INDYS and Prime DC, the prostitution businesses owned and operated by Mr. Asuen.  The calculation includes a two level upward adjustment pursuant to USSG § 3B1.1(c) for Mr. Asuen's role in directing the activities of the two individuals who picked up money from the women working for his prostitution business. (PSR, ¶ 78).  The probation officer calculated an offense level of 14 on the Travel Act conspiracy without applying a role adjustment because Mr. Asuen was charged in that count with being a conspirator in Mr. Akuiyibo's prostitution business and was viewed by the probation

1

officer as being an "average" participant and not a leader in Mr. Akuiyibo's business (PSR, ¶ 78).

The probation officer also applied five additional levels under the grouping rules for closely related counts pursuant to USSG § 2G1.1(d)(1) which provides that "[i]f the offense involved more than one victim, Chapter Three, Part D, (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction." Under § 3D1.4, Mr. Asuen's offense level was increased by the maximum of five levels for additional victims, resulting in a combined offense level of 23. With a three level reduction for acceptance of responsibility and a criminal history category I, the probation officer calculated a total offense level of 20 with an advisory guideline range of 33 to 41 months.

Mr. Asuen objects to the upward adjustment for role in the offense. He also objects to the inclusion of paragraph 56 of the Presentence Report because the statement was provided pursuant to a proffer agreement which provided that no statement or other information provided by the defendant will be admissible at sentencing.[1] The government agrees that paragraph 56 should be removed from the Presentence Report. Mr. Asuen's remaining objections were resolved by the probation officer. While he agrees that the five level upward adjustment for additional victims is properly calculated, Mr. Asuen believes that the guideline fails to distinguish between is conduct and the conduct of other defendants who threaten or coerce their victims to engage in prostitution.

### The Two Level Upward Role Adjustment Is Based On Conduct That Merges With The Travel Act Conspiracy And Is Precluded Under *United States v. Santos*.

---

[1] Mr. Asuen does not dispute the information contained in this paragraph, however, he objects to the use of his statement in violation of the proffer agreement.

The probation officer determined that Mr. Asuen should receive a two level upward adjustment pursuant to USSG § 3B1.1(c) for being an organizer and leader of money laundering activity that involved less than five participants because he directed the activities of his brother and K.F. by instructing them on when and where to pick up the proceeds of his prostitution business. (PSR, ¶ 78). To the extent that the upward adjustment is based upon Mr. Asuen arranging for his brother and K.F. to pick up money from the prostitutes and deposit that money into bank accounts used to pay the essential expenses of the underlying prostitution business, the adjustment is precluded by the Supreme Court's decision in *United States v. Santos*, 553, U.S. 507 (2008) and the Fourth Circuit's recent decisions in *United States v. Halstead*, 634 F.3d 270 (4th Cir. 2011); and *United States v. Cloud*, 680 F.3d 396 (4th Cir., 2012).

In *United States v. Santos*, 553, U.S. 507 (2008), a plurality of the Supreme Court held that the term "proceeds" in the provision of the money-laundering statute which criminalizes transactions to promote criminal activity refers to "profits" rather than "gross receipts" at least as applied to illegal gambling activities. The Court held that "[a]llowing the Government to treat the mere payment of an illegal gambling business' operating expenses as a separate offense is in practical effect tantamount to double jeopardy." *Id*. at 508. The Court went on to explain that:

> [i]f "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, (citation omitted), would "merge" with the money-laundering statute.

*Id*. at 515-16. The Court held that interpreting "proceeds" to mean "net profits" not "gross receipts" eliminates the merger problem, explaining that "[a] criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-

3

laundering statute, because by definition profits consists of what remains after expenses are paid. Defraying an activity's costs with its receipts simply will not be covered." *Id*.

Looking past illegal gambling, Justice Scalia reasoned that:

> For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds – for example, the felon who uses the stolen money to pay for the rented getaway car – would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering.

*Id*.

Since *Santos*, the Fourth Circuit has addressed this issue in *United States v. Halstead*, 634 F.3d 270 (4th Cir. 2011) and *United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012). In *Halstead*, the Fourth Circuit read *Santos* to require a restricted interpretation of "proceeds" only when a broader interpretation would risk a "merger" of a money laundering crime and a crime for operating an illegal gambling business.[2] The court reasoned that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" The court also decided that further development of a solution to the merger problem should be left to a case that presents the problem. *Halstead*, 634 F.3d at 277 (*citing Marks v. United States*, 430 U.S. 188, 193 (1977)). Because the financial

---

[2] *See also United States v. Howard*, 309 Fed.Appx. 760 (4th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct. 62, 175 L.Ed.2d 46(2009) (holding that the term "proceeds" in the money laundering statutes generally means "receipts," not "profits," and that *Santos* applied only to money laundering cases in which the predicate offense was illegal gambling).

4

transactions in the underlying healthcare fraud charged in *Halstead* were different from the transactions prosecuted as money laundering, the court determined that the merger problem recognized in *Santos* was not present in that case.[3]

More recently, the Fourth Circuit analyzed *Santos* in the context of a mortgage and bank fraud case. In *United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012), the defendant recruited buyers with good credit to purchase properties with no money down, offering to split the profit when he eventually sold the properties. Cloud bought the properties shortly before the buyers and then flipped the properties to the buyers, making money off of each transaction. Cloud paid kickbacks to buyers, at least one mortgage broker, and the recruiters responsible for finding the buyers and loaned money for a previous closing and money used for mortgage payments. Cloud was convicted on one count of mortgage fraud conspiracy, three counts of bank fraud, one count of money laundering conspiracy and six counts of money laundering. Although Cloud was not convicted of operating an illegal gambling business, the court, nevertheless, concluded that it was required to determine whether a merger problem existed on the facts of the case before it. As in *Santos*, the court held that Cloud's substantive money laundering convictions suffered from a merger problem because they charged the payment of the "essential expenses' of the fraud. *Id*. at 403, 406.[4]

---

[3] In *Halstead*, the court found that the crime of healthcare fraud was complete when Halstead directed the owner of a medical clinic to submit fraudulent claims to healthcare providers and those companies paid those claims. Subsequent transfers of money from the medical clinic to Halstead were separate transactions constituting money laundering. 634 F.3d at 280-81.

[4] The court reached a different conclusion with respect to the conspiracy to commit money laundering charge because there was evidence that Cloud used the profits from his previous flips to finance additional purchases, not to pay for services performed. In utilizing monies from previous properties to finance future purchases, the court held that Cloud was not paying the "essential expenses of the underlying crime. Thus the money laundering conspiracy count did not present a merger problem. *Id*. at 408.

Because Mr. Asuen's money laundering conspiracy conviction cannot be based the payment of the "essential expenses' of the prostitution business, the 60% of gross receipts that the prostitutes retained as their payment have not been treated as "proceeds" of the money laundering conspiracy and are therefore, not forfeitable because it was necessary for the "johns" to pay the prostitutes in order to complete the prostitution offenses.[5]

Similarly, the upward role adjustment cannot be based on Mr. Asuen's role in directing the activities of the money collectors who picked up and deposited money in bank accounts utilized by Mr. Asuen to pay the "essential expenses" of operating the prostitution business. The use of those accounts is described in paragraph 11 of the Statement of Facts which provides:

> 11. "The defendant, and his employees, deposited cash earned from the prostitution business into either his own bank accounts or into a bank account in his brother's name. The accounts were used by the defendant to promote the carrying on of the business by paying for expenses and keeping lines of credit open in order to meet future expenditures. The defendant alternated the use of these bank accounts to avoid having large cash deposits flowing into either account."

As was the case with the payments to lottery winners in *Santos*, payments from these accounts for essential expenses that were intended by Mr. Asuen to promote the carrying on of his prostitution business are not money laundering transactions. The Presentence Report does not point to any evidence of the kind of financial transactions occurring in *Halstead* where the "net profits" of the underlying healthcare fraud were transferred to a separate account controlled by the defendant after the healthcare fraud was complete. Without evidence of similar financial transactions, Mr. Asuen's role in directing the activities of the money collectors whose activities,

---

[5] The Plea Agreement calls for the imposition of a money judgment in the amount of $727,193 (as opposed to the $1,800,000 in gross proceeds generated by Prime DC and DMV INDYS), which reflects the total amount Mr. Asuen collected and deposited into his accounts. Mr. Asuen agreed to entry of a money judgment that includes amounts used to pay for some of the essential expenses of the prostitution business as part of his plea negotiations.

like those of the prostitutes, were a necessary part of paying the essential expenses of the underlying offense, does not support the upward adjustment.

## II. BOOKER AND 18 U.S.C. § 3553(a) FACTORS

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), now requires district courts to consider both the Sentencing Guidelines and all of the factors contained in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence. The Supreme Court has firmly instructed that sentencing courts "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007); accord *Nelson v. United States*, 555 U.S. 350 (2009). ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable"). Rather, a sentencing court must make an "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. Above all, a court's final determination of a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation. See *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

*Rita* made clear, and *Kimbrough* affirmed, that in making these individual assessments, sentencing courts are free to disagree with the guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the guidelines. As the Supreme Court noted, "[a]s far as the law is concerned, the judge could disregard the Guidelines . . ." *Rita*, 551 U.S. at 353. As the Court put it in *Rita*,

7

> The upshot is that sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic 3553(a) objectives.

*Id*. at 348.

Moreover, in *Kimbrough*, the Supreme Court effectively acknowledged that not all guidelines are equal. While some "exemplify the Commission's exercise of its characteristic institutional role," others to not. *Kimbrough*, 552 U.S. at 109. Mr. Asuen submits that this is the case with USSG § 2G1.1(d)(1) which provides that "[i]f the offense involved more than one victim, Chapter Three, Part D, (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction."

Thus, this Court must begin its analysis by correctly calculating the advisory sentencing range, but it is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence - one which is "sufficient, but not greater than necessary to comply with" the statutory goals of sentencing. *See Rita,* 551 U.S. at 350-51.

The Court must impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a) which are "the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider the nature and circumstances of the offense and the history and characteristics of the

8

defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 355(a)(1)-(7).

### A. The Nature and Circumstances of the Offense

Much has already been written about the nature of Mr. Asuen's conduct. Mr. Asuen started DMV INDYS, formerly Prime DC after losing his IT job at a D.C. law firm following a merger with a larger firm. Mr. Asuen tried unsuccessfully to find other employment for more than a year before asking Kuraye Akuiyibo to assist him in starting his own internet prostitution business in 2009.

In order to establish his business, Mr. Asuen placed newspaper advertisements and online advertisements on Craig's List to solicit women in the D.C. metropolitan area to work as "escorts." In approximately 2010, he began recruiting women from places throughout the United States by placing advertisements on www.backpage.com. In early 2011, Mr. Asuen changed the name of his prostitution business from Prime DC to DMV INDYS.

As indicated in the Presentence Report and Mr. Asuen's Statement of Facts, the women who worked for Mr. Asuen kept 60% of the hourly rate charged to the "johns." Out of the 40% that Mr. Asuen retained, he paid for salaries, advertising, maintaining an internet website and a portion of women's airfares, transportation and hotel rooms. Mr. Asuen communicated with the women who answered his advertisements using telephones, text messages or emails. He maintained an internet web site which K.F. created for him to manage and promote his prostitution business. The web sites for Prime DC and DMV INDYS posted pictures of various women, their physical characteristics, their "working name," the types of sexual services they would provide and their hourly rates. The web site also posted contact numbers so clients could call or email the respective agency to book dates with the prostitutes.

Mr. Asuen used the internet to make online hotel reservations for the women and to book airline reservations for their travel. He communicated with the women about their travel plans and gave them instructions on where to go and what to do upon their arrival. After the women arrived at their hotels, Mr. Asuen took their photographs which he emailed to a photoshop editor before placing them on his web site.

Mr. Asuen employed two call takers to answer the telephones and to schedule appointments for the women. The call-takers "screened" the incoming callers to ensure that the "johns" did not have a history of engaging in abusive or violent behavior and did not work for law enforcement. He also employed his brother and K.F. as money collectors to pick up money from the women at the various hotels. Mr. Asuen, his brother and K.F. deposited the cash earned from Mr. Asuen's prostitution businesses into either his own bank accounts or into a bank account in one in the name of another brother.

Mr. Asuen's prostitution businesses catered to high paying customers who sought discrete encounters with relatively sophisticated women. The services provided by the women who worked for Mr. Asuen were consensual. The women searched out Prime DC and DMV INDYS' online ads and willingly traveled from locations throughout the country to work for his prostitution business, paying part or all of their own plane fares. Because the services they performed were very lucrative, many of these women chose to return for repeat "tours."

Some of the women stole or skimmed money which was not an uncommon practice in the prostitution business. The reference in the government's Position on Sentencing referring to discussions Mr. Asuen had with Mr. Akuiyibo about how to minimize or prevent the prostitutes from "stealing" their funds is based on statements Mr. Akuiyibo made during a government debriefing. According to discovery produced by the government on August 27, 2012, , Mr.

10

Akuiyibo stated that he and Mr. Asuen had decided to stop telling the girls when the money was going to be picked up. He also stated that he and Mr. Asuen discussed creating a web site called "Girls that Steal" so that other agencies wouldn't hire them. Mr. Akuiyibo explained that this conversation occurred after he received an email from Mr. Asuen who had stumbled onto a Philadelphia web site advertising eight the women who had stolen money from them. This is the email referred to in the government's Position on Sentencing.[6] Mr. Akuiyibo's statements are contained in the same discovery produced by the government on August 27, 2012.

     The government's Position on Sentencing also described information provided by C.A., a prostitute who worked for Classy during the summer of 2009. In particular, during her first "tour" for Classy, C.A. stated that Mr. Akuiyibo told her that her first client would be his "brother" who C.A. described "as a black male, tall like Akuiyibo, with a thin build and clean cut." The government claims that C.A. "positively identified" a photograph of Mr. Asuen as the "brother" she met. Mr. Asuen denies that he was the individual described by C.A. According to the discovery produced on August 27, 2012, C.A. was interviewed by the F.B.I. on December 21, 2011. During that interview, C.A. described Mr. Akuiyibo as "about 6 feet tall, thin and well dressed." She also stated that she had three clients her first night and that she was paid $300 per person. She was shown a series of seven photo lineups, each containing six photographs. C.A. circled Mr. Asuen's photograph and wrote "looks like G's brother." This is hardly a "positive identification." The photograph that was made available for counsel to review does not bear a strong likeness to Mr. Asuen.

---

[6] The email referred to by the government in its position on sentencing contains the only evidence of comments of this nature by Mr. Asuen out of the thousands of emails produced by Yahoo pursuant a government subpoena for that email account. A CD produced by the government containing the information provided by Yahoo's included a text file with 2,797,492 KB of data.

The fact remains that government has been unable to identify even one woman who claimed that she had been pursued by Mr. Asuen, either because she stole money from him or chose to stop working for him. Nor has the government identified a single woman who complained of threats or mistreatment at Mr. Asuen's hands.

Mr. Asuen submits that the addition of five additional levels under § 2G1.1(d)(1) for more than five victims fails to distinguish between his conduct and the conduct of defendants who abuse their victims or coerce them to engage in commercial sex acts or prohibited sexual conduct. For this reason, The Court should feel free to disagree with the policy decisions of the Sentencing Commission contained in this guideline.

USSG § 2G1.1(d)(1) provides that "[i]f the offense involved more than one victim, Chapter Three, Part D, (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction." Application Note 5 to § 2G1.1(d) provides:

> Special Instructions at Subsection (d)(1). – For the purposes of Chapter Three, Part D (Multiple Counts), each person transported, persuaded, induced, enticed, or coerced to engage in, or travel to engage in, a commercial sex act or prohibited sexual conduct is to be treated as a separate victim. Consequently, multiple counts involving more than one victim are not to be grouped together under § 3D1.2 (Groups of Closely Related Counts). In addition, subsection (d)(1) directs that if the relevant conduct of an offense of conviction includes the promoting of a commercial sex act or prohibited sexual conduct in respect to more than one victim, whether specifically cited in the count of conviction, each such victim shall be treated as if contained in a separate count of conviction.

Under the grouping rules in § 3D1.4, Mr. Asuen's offense level was increased by the maximum of five levels for additional victims because he had more than 50 victims.

Application Note to § 2G1.1 defines "victim" to mean "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, *whether or not the person consented to the commercial sex*

12

*act or the prohibited sexual conduct.*" (emphasis added). The guideline adds up to five levels for any defendant charged with running a prostitution business whether the prostitutes are non-consenting, first timers who are tricked into working for pimps who steals their money, or are career prostitutes or porn stars who are well paid and have chosen prostitution as a way of life. Indeed, this is the only guideline that blurs the distinction between willing participants and coconspirators.[7]

Mr. Asuen's "victims" freely chose to engage in commercial sex acts. They responded to classified advertisements Mr. Asuen placed on the internet from the safety of their homes and readily traveled to the D.C metropolitan area, in many instances, paying their own way, for the sole purpose of engaging in prostitution. They worked for a week at a time and after returning home, many of the women chose to return for additional "tours." It is fair to assume that many if not most of the women who worked for Prime DC and DMV INDYS had been prostitutes long before responding to Mr. Asuen's internet ads and more than likely, still work as prostitutes today, either independently or with different agencies. In a case such as this, where the addition of five levels almost doubled Mr. Asuen's guideline range from 18 to 24 months (level 15) to 33 to 41 months (level 20), a sentence below the guidelines is than sufficient to promote respect for the law and provide just punishment for the offense.

### B. History and Characteristics of the Defendant

Mr. Asuen is 32 years old. Apart from a reckless driving conviction in 2009, he has no criminal history. Like Mr. Akuiyibo, Mr. Asuen was born in Nigeria and moved to the United States as a teen ager, growing up in a difficult neighborhood in Elizabeth, New Jersey. One of

---

[7] It also bears noting that soliciting prostitution is a misdemeanor offense in Virginia, Maryland and the District of Columbia. Under state law, the women who engage in prostitution are not treated as victims.

his brother remembers vividly "one night when my brother talked a friend out of joining a local gang eventually saving that friend's life."  See letter from Osayi Asuen (Attachment 2).  He grew up in a family of six brothers and sisters with parents who dedicated their lives to teaching them good values and instilling in them the importance of an education.  Even before graduating from college, Mr. Asuen began working as an IT specialist for a variety of companies to earn his way through school.  After working as a computer programmer and a systems engineer, he was hired by a Washington, D.C. law firm until his position was eliminated after a merger with a larger firm.

Prior to losing his position at the law firm, Mr. Asuen led a completely law abiding life, and as one of his sisters stated, "was heading for a path to greatness."  See letter from Ukinebo Asuen.  (Attachment 3).  When speaking about Ms. Asuen's character, his sister describes him as a very determined and ambitious person with a kind and caring nature.  According to Ukinebo, "Otas is not a confrontational person and doesn't like conflict, he lights up any and every environment he is in and brings life to any situation no matter how bad . . ."  She has also observed his remorse and willingness to learn from his mistakes.

Mr. Asuen's younger brother describes him in similar terms, recalling the brotherly advice Mr. Asuen gave him by convincing and helping him apply to colleges and for scholarships, advising him to stay on campus and become more involved with the student body, and to volunteer during leisure time.  See letter from Osayi Asuen.  (Attachment 2).  Mr. Asuen also encouraged Osayi to apply for an internship that turned out to be critical to securing employment after graduation.

Mr. Asuen's friends speak of him in the same way.  For example, his friend Mary D describes him as a "very caring, loving, and giving person.  She describes him as family oriented

and a Christian man. According to Ms. D, he is always willing to lend a helping hand and will always go the extra mile for any family member, friend, and even a stranger." If there is anyway (sic) that Otasowie can help to alleviate any hardship some is experiencing in life, he is always the first person willing to help." See letter from Mary D. (Attachment 4). Similarly, his friend, Hyvron Jean describes Mr. Osuen in the following terms:

> "Otas is one of the greatest individual (sic) that I know of. Growing up in Elizabeth NJ, future for a young black man like myself is bleak. In high school, he helps me stay focused to graduate by motivating me to follow my dreams. After high school, he convinces his older brother who at the time was living in Silver Spring MD to let me stay in his home while I attended a technical school because my mother could not afford to support me while I was in school. As he did in high school, he stood by me and not let me quit until I was able to get my A+ Certification. As I'm typing this letter I remember how Otas and his brother was helping me with my resume after I finished the school so I can apply for a job in the IT field. Throughout my adult life, he has been a constant positive influence in my life." See letter from Hyvron Jean. (Attachment 5).

Mr. Hyvron and others close to Mr. Asuen were understandably kept in the dark about Mr. Asuen criminal activity and his escalating abuse of alcohol and drugs – behavior that undoubtedly contributed to the uncharacteristically poor choices Mr. Asuen made by involving himself in the prostitution business. Mr. Hyvron has committed himself to assisting Mr. Asuen right his mistakes and return to society a better person, as have each of the members of Mr. Asuen's family.

      Mr. Asuen has already taken meaningful steps in this direction. Thomas Buschman, a retired journalist who has been leading bible classes at the Alexandria Adult Detention Center has taken the time to write on Mr. Asuen's behalf. He describes Mr. Asuen as having accepted Jesus Christ as his personal Savior and as having every intention of turning his life around. In particular, Mr. Buschman writes:

> "Since first meeting Mr. Asuen ("Tas"), I have seen a positive change in his attitude and outlook on life. He almost never misses a bible study; he asks

15

questions, makes comments and exhibits a growing understanding of scripture and its necessary application to actual life situations. He also encourages other inmates to attend and reaches out to make new inmates feel welcome.

"Mr. Asuen gives every indication that he genuinely regrets his past behavior, has turned his life around, and is ready to become a law-abiding and productive member of society. I see a new sense of purpose and direction in his life and a commitment to live for Christ both now and after he is released." See letter from Thomas W. Buschman. (Attachment 6).

Mr. Asuen feelings of shame and guilt have made him determined to come out a prison a better man.

### The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Avoid Unwarranted Disparities

Mr. Asuen submits that a sentence in the range of 20 to 24 months is sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment. A sentence within this range is also consistent with the sentences received by defendants in three recent cases who have pled guilty to Travel Act and money laundering charges related to escort agencies. As pointed out by Mr. Akuiyibo's counsel in his Position on Sentencing, the head of the Emperors Club VIP escort service in New York (made famous by Elliot Spitzer's involvement as one of its clients) received a sentence of 30 months despite running an international prostitution business for four years that charged three day rates of as much as $50,000 for its prostitutes. *See United States v. Mark Brener*, Case No. 1:08cr00533 (S.D.N.Y.). The day-to-day manager of the Emperors Club VIP who opened a bank account that was used to launder the prostitution business' proceeds and answered phones for two years before assuming other managerial responsibilities, including actively marketing the club's prostitution services and recruiting and training new prostitutes, received a sentence of six months. *See United States v. Cecil Suwal*, 1:08cr00497 (S.D.N.Y.). The head of Miami Companions received a sentence of fourteen months after admitting to running an escort service that operated throughout the United

16

States, listed over 30,000 clients, booked more than 100 appointments a day, set up a call center in Panama to lower costs and avoid detection and on occasion was involved in the transportation of illegal aliens for the purpose of prostitution. *See United States v. Gregory Carr*, 2:10cr20400 (E.D. Mich. 2011).[8]

Ms. Opuiyo, who managed the day-to-day operations of Classy's prostitution business, received a sentence of 20 months. In its Position on Sentencing in Ms. Opuiyo's case, the government estimated the volume of Classy's business based on the volume of telephone calls and text messages intercepting during its investigation. According to the government, Classy booked one-hour "dates," 24 hours a day, seven days a week. The government also estimated the amount of cash proceeds generated by Classy to be in excess of $4,000,000. The probation officer calculated Ms. Opuiyo's guidelines as offense level 18, with a criminal history category II, resulting in a guideline range of 30-37 months. The United States recommended that Ms. Opuiyo receive a sentence within the guidelines range. Although Ms. Opuiyo managed the daily affairs of the business, her guideline range was not increased by five levels pursuant to § 2G1.1(d)(1) for more than one victim.

Mr. Asuen submits that his absence of a criminal history makes a sentence in the range of 20 to 24 months does not create an unwarranted disparity with the other defendants in this case and is sufficient to promote respect for the law and provide just punishment.

WHEREFORE, based on the foregoing and such other reasons as the Court may consider at sentencing, it is respectfully requested that this Court impose a sentence in the range of 20 to 24 months.

---

[8] In *Brenner* and *Carr*, the government did not seek and the courts did not impose the five-level upward adjustment for transporting more than five women. In *Carr*, the government recommended a sentence of 27 months.

                Respectfully submitted,

                OTASAWIE CHRISTOPHER ASUEN
                By Counsel

/s/ _____
Nina J. Ginsberg, Esquire
VSB # 19472
Attorney for Defendant
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
703-684-4333
703-548-3181 (Fax)
nginsberg@dimuro.com

## CERTIFICATE OF SERVICE

    I hereby certify that on this 28th day of August, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

    I further certify that a copy was sent by e-mail to:

        Joanne Lauder, Probation Officer
        joanne_lauder@vaep.uscourts.gov

                /s/ _____
                Nina J. Ginsberg, Esquire
                VSB No. 19472
                Counsel for Defendant
                DiMuroGinsberg, P.C.
                1101 King Street, Suite 610
                Alexandria, VA 22314
                703-684-4333
                703-548-3181 (Fax)
                nginsberg@dimuro.com